UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
DANIEL STEIN,

                              Plaintiff,

              -against-                                    05 Civ. 9147 (LAK)


MICHAEL GELFAND,

                              Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**


              Appearances:


                              Scott M. Berman
                              Laurence D. Borten
                              FRIEDMAN KAPLAN SEILER & ADELMAN LLP
                              *Attorneys for Plaintiff*


                              David Epstein
                              *Attorney for Defendant*


LEWIS A. KAPLAN, *District Judge.*

              Plaintiff and defendant allegedly entered into an oral partnership agreement that

contemplated the acquisition by the enterprise of cellular telephone assets and their operation as a

business.  They are said to have agreed that plaintiff would be owner of 20 percent and defendant of

80 percent of the equity.   The assets subsequently were acquired by a limited liability company

owned solely by defendant.   The Federal Communications Commission ("FCC") approved the

necessary license transfer, but the parties then were unable to reach agreement on the terms of legal

2

instruments giving effect to their alleged relationship. Plaintiff then brought this action for damages for breach of fiduciary duty and of contract, unjust enrichment, and promissory estoppel. Defendant moves for summary judgment dismissing the complaint.

*Facts*

A.      *The Alleged Transaction*

The crux of this case is whether plaintiff Stein and defendant Gelfand entered into an oral partnership agreement for the acquisition of the cellular telephone assets. There are sharp conflicts in the testimony on this and other issues. Gelfand, however, seeks summary judgment dismissing the complaint on the ground that he would be entitled to judgment as a matter of law even if Stein's version of events were credited. Accordingly, I assume the truth of Stein's version of the events for purposes of this motion.[1]

The parties have known each other for over 30 years, during which Gelfand and the Stein family continuously have been friends.[2] In February 2003, Gelfand told Stein that he had received from Legg Mason, an investment banker, an offer to sell various clusters of cellular assets in the northeast and that he would like Stein to participate in the transaction with him.[3] There was

----

[1]     "The mere existence of *some* alleged factual dispute . . . will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Fax Telecommunicaciones Inc. v. A T & T*, 138 F.3d 479, 485 (2d Cir. 1998) (quoting *Davidson v. Scully*, 114 F.3d 12, 14 (2d Cir.1997)) (emphasis in original) (internal quotation marks omitted). The acceptance *arguendo* of Stein's account renders the issues of fact as to its veracity immaterial for purposes of the motion.

[2]     Stein Dep. 54; Gelfand Dep. 27-28.

[3]     Stein Dep. 57-58.

no mention of the amount of the investment that was contemplated.[4]  Following that conversation, Gelfand sent Stein the offering document.[5]

The parties spoke again at the end of February.  According to Stein, Gelfand again asked Stein to participate in the investment and asked him what amount he would like to invest. Stein replied "20 percent."  He testified also that "[a]t that time we agreed that we would manage the business together and that we would share in losses and profits, hopefully profits and losses as opposed to losses and profits."[6]  Nothing else was discussed with respect to the terms of the proposed transaction.[7]

The parties next spoke about the deal at a meeting on June 12, 2003 attended also by Lawrence Movsin, Gelfand's attorney.[8]  On that occasion, Gelfand "reiterated the arrangement that [they] had come to."[9]  He informed Stein that he had formed a company called Buffalo Lake Erie Wireless Company, LLC ("BLEW") to acquire the assets.  He suggested that Gelfand  apply to the FCC for approval of the license needed to operate the business "because he [Gelfand] had a long

---

[4]
      *Id.* 58.

[5]
      *Id.*

[6]
      *Id.* 60.

[7]
      *Id.* 62.

[8]
      *Id.* 62-63; *see also id.* 67 (no discussion between February and the June 12 meeting).

[9]
      *Id.* 63.

4

history with them" and that Stein would be admitted to the LLC when FCC approval was obtained.[10]

On August 6, 2003, BLEW executed an agreement to purchase the assets in question for $4 million.[11]  The FCC approved the license transfer application on November 7, 2003.[12]  The closing was scheduled for December 23, 2003.[13]

On a number of occasions, Stein asked Gelfand "to get the terms of [Stein's] admittance into the LLC down on paper."[14]  He reiterated this request in November 2003.[15]  Gelfand then asked Stein "to prepare bullet point notes on [his] admittance into the LLC agreement," which resulted in Stein's preparation of a memorandum dated November 18, 2003.[16]

The November 18 memorandum proposed the following key points:

•     Stein and Gelfand both would be Managing Members of the LLC.

•     Either Stein or Gelfand generally could act on behalf of the company,

---

[10]

*Id.* 62-63, 80-81.

Parenthetically, I note that Stein claims that Gelfand at some point agreed that Stein's father, Cyril Stein, also would participate to the extent of 5 percent.  The parties' respective interests therefore became Gelfand 75 percent, Daniel Stein 20 percent, and Cyril Stein 5 percent.

[11]

Borten Decl. ¶ 12 & Ex. 11, § 3.1 at DS 02677.

[12]

Borton Decl. Ex. 16.

[13]

Stein Decl. ¶ 17.

[14]

Stein Dep. 100-01.

[15]

Stein Decl. ¶ 8.

[16]

Stein Dep. 98; Stein Decl. Ex. A.

5

although certain material actions would require the agreement of both.

- Stein would participate in the management of the LLC, albeit not as an employee, and spend about one day a week at its offices.

- Both Stein and Gelfand would be obliged during the first three years after the purchase to lend money, in proportion to their respective investments, to the LLC up to a maximum amount of $10 million. Stein proposed that they discuss whether such loans should be secured or unsecured.

- The LLC would have the authority, if Stein and Gelfand did not satisfy the commitment to loan money to it, to borrow up to $10 million from a third-party lender on commercially available terms. In that event, Gelfand, but not Stein, would be obliged to provide a personal guarantee.

- The LLC and then the remaining member would have a first refusal on the interest of the other in the event of the other's death, disability or desire to sell.

Stein and Gelfand discussed the memorandum by telephone. Although Gelfand allegedly objected to nothing else, he raised issues as to (1) how he and Stein would handle any situation in which they disagreed concerning a significant decision, and (2) why only he should be obliged to provide a personal guarantee to any commercial lender.[17] Stein responded with a second memorandum, this one dated November 28, 2003.[18]

---

[17] Stein Decl. ¶¶ 13-15.

[18] *Id.* ¶ 16.

The November 28 memorandum responded to Gelfand's point concerning guarantees by arguing that it was not in the interests of either party to have Stein give a personal guarantee. Stein offered, however, to provide Gelfand with a side letter agreeing to reimburse Gelfand for up to 25 percent of any amount Gelfand actually paid to a lender on his guarantee, up to a maximum of $2.5 million, "but only after [Gelfand] ha[d] fully settled any guarantee claim."[19]  The memorandum spoke also of the parties being "on the same footing" and having "equal commitment to the success and health of this venture" to justify Stein's insistence on a say equal to Gelfand's on major business decisions notwithstanding the disparity of their economic contributions.[20]

On December 19, 2003, Stein offered to pay Gelfand his share of the purchase price for the assets.  Gelfand told him "not to worry."[21]  On the evening of December 23, 2003, he sent Stein a draft of an operating agreement for BLEW that did not meet with Stein's approval.[22]

The transaction closed on December 24, 2003.[23]  The parties continued to communicate for some time regarding the transaction, but the details are not material.[24]  It suffices to say that no agreement was reached.  On March 31, 2004, Stein commenced proceedings before

---

[19]    Stein Decl. Ex. B.

[20]    *Id.*

[21]    Stein Decl. ¶ 18.

[22]    *Id.* ¶¶ 19-21 & Exs. C, D.

[23]    *Id.* ¶ 17.

[24]    *Id.* ¶¶ 22-30.

a rabbinical court.[25]


B.      *The Lawsuit*

The complaint contains four claims for relief, all of which depend upon the allegation that Gelfand's acquisition of the business himself, without Stein's participation, was wrongful.  The four claims for relief allege breach of fiduciary duty, breach of contract, unjust enrichment and promissory estoppel.


*Discussion*

A.      *The Summary Judgment Standard*

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[26]  Where the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.[27]  In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.[28]

---

[25]

*Id.* ¶ 31.

[26]

*E.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir. 2000); *see also* Fed. R. Civ. P. 56(c).

[27]

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Virgin At. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 273 (2d Cir. 2001).

[28]

*See, e.g.*, *Raskin v. Wyatt Co.*, 125 F.3d 55, 65-66 (2d Cir. 1997).

B.      *Analysis*

    1.      *The Contract and Fiduciary Duty Claims*

Oral contracts occupy a venerable position in our jurisprudence. When not barred by the statute of frauds, they are just as binding as written contracts. But the ultimate question is whether there was an oral contract – that is, whether Stein and Gelfand intended their February conversation to result in a legally binding obligation.[29] Moreover, just as parties must retain the freedom to enter into oral contracts, "[f]reedom to avoid oral agreements is especially important when business entrepreneurs and corporations engage in substantial and complex dealings . . . . The actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution. Details that are unnoticed or passed by in oral discussion will be pinned down when the understanding is reduced to writing."[30]

Where, as here, the issue turns on whether parties intended to be bound, courts look to four factors to inform the decision: (1) whether a party made an express reservation of the right not to be bound in the absence of a signed writing, (2) whether there has been partial performance, accepted by the party disclaiming the contract, (3) whether all of the terms of the alleged contract have been agreed upon, and (4) whether the agreement is the type of contract that usually is

---

[29]

    Stein argues also that Gelfand owed him fiduciary duties arising from their personal relationship.  His deposition testimony is clear, however, that they were on equal footing in their business ability – each turned to the other for consultation and advice.  Stein Dep. 264.  Further, the parties had never done business together prior to 2003.  *Id.* 69.  With no prior transactions and no evidence of a relationship of reliance or dependence, no fiduciary relationship reasonably can be found.  *See Rosenblatt v. Christie, Manson & Woods Ltd.*, No. 04 Civ. 4205 (PKC), 2005 WL 2649027, at *9-10 (S.D.N.Y. Oct. 14, 2005); *SEC v. Singer*, 786 F. Supp. 1158, 1169-70 (S.D.N.Y. 1992).

[30]

    *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75 (2d Cir. 1984).

9

committed to writing.[31]

In this case, two of these factors strongly and unequivocally cut against a conclusion that the parties intended to be bound short of the execution of a definitive written agreement, even on Stein's version of the events.

First, the exceptionally brief conversation he claims occurred in late February 2003 did not even begin to address all of the terms that would have had to have been agreed, as indeed became clear when the parties attempted to set down the alleged agreement in writing. Nothing was said about the respective roles of Stein and Gelfand in the management of the business, about the size of the financial commitment, about the respective obligations of Stein and Gelfand in the event the business needed to raise additional capital once it was purchased, about what would occur if one of the two died or wished to exit the investment, or about a host of other matters that quite plainly had to be dealt with in a multimillion dollar transaction before anyone was legally committed.

Second, transactions of this sort usually are committed to writing. This is true even if, as Stein contends, the parties have been friends for over 30 years.

Stein argues that the remaining two factors support him. He denies that there was any express reservation of the right not to be bound absent an executed writing, and he claims that he partially performed and that Gelfand accepted that performance. But these contentions have to be taken in context.

According to Stein, the binding contract was formed in a brief telephone conversation in which Gelfand asked Stein to participate in a deal to buy the cellular phone assets, Stein

---

[31] *Id.* at 75-76. *Accord, Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 323 (2d Cir. 1997); *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985).

10

responded, in substance, "Put me down for 20 percent," and the two agreed to share profits and losses and manage the business together. But this was a sizeable transaction. Many important terms had not yet even been discussed, let alone resolved. In such circumstances, few if any reasonable business people would think that there was even a remote possibility that any legal obligation had arisen from such a conversation, so there would have been no reason to express any reservation.[32] The extent to which this factor supports Stein therefore is limited.

Stein claims also that he participated in the business[33] in the period February through December 2003 by, among other things, taking part in negotiations for the purchase of the assets, inspecting the assets, and working with Gelfand to find personnel and make other arrangements in anticipation of the acquisition.[34] He argues that this was partial performance, accepted by Gelfand.

This argument too goes only so far. As an initial matter, it is doubtful that it is properly characterized as partial performance. The alleged contract, after all, was for Stein to contribute 20 percent of the acquisition cost and then to run the acquired business with Gelfand. Stein's conduct in this period perhaps more properly is viewed as preparation for the transaction rather than as performance. Indeed, the complaint itself characterizes it as "preparing to acquire and

---

[32]

      *See Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 550 n.7 (2d Cir. 1998) (finding no express reservation "not dispositive" because "[a] reservation of right not to be bound presumes that there is some expression of commitment or agreement in the writing to begin with, which, as already noted, is lacking here").

[33]

      That of course is impossible, if it is meant literally, because the business was not acquired until December 24.

[34]

      Stein Decl. ¶ 7.

operate the Business."[35]  Thus, while it is evidence that Stein hoped or expected that he and Gelfand would reach agreement and that the deal would go forward, it is not particularly probative of whether the parties intended their February conversation to have given rise to any legal obligation.

The point is analogous to one that arises in the context of the statute of frauds, where part performance of an alleged oral agreement *may* be sufficient to avoid the bar of the statute.  The reason for the qualification is that not just any partial performance will suffice.  As the Second Circuit, quoting Judge Cardozo, has written:

> "part performance . . . 'must be performance "unequivocally referable" to the agreement, performance which alone and without the aid of words or promise is unintelligible or at least extraordinary unless as an incident of ownership assured, if not existing.'"[36]

Although the point at issue here is not the statute of frauds, the same reasoning applies.  In each case, the underlying policy is to guard against claims of legal obligation based on self-interested and often unverifiable accounts of supposed oral statements.  In each case, partial performance is offered as evidence that in fact the parties did reach a binding commitment.  The value of such evidence, however, depends upon the extent to which the alleged part performance is explicable on the theory that there must have been a contract.  In the statute of frauds context, it must be "unequivocally referable" to – that is, "unintelligible or at least extraordinary" in the absence of – the alleged contract in order to ensure that the statute is not easily circumvented by ambiguous evidence.

I do not go so far in this context, as my point is more limited.  The issue before me

---

[35]    Cpt. ¶ 23.

[36]    *Huntington Towers, Ltd. v. Franklin Nat'l Bank*, 559 F.2d 863, 872 (2d Cir. 1977) (quoting *Burns v. McCormick*, 233 N.Y. 230, 232, 135 N.E. 273, 273 (1922)).

is the extent to which Stein's actions in the February through December 2003 period corroborate his claim that the parties intended to be bound by the February conversation. His actions were the sorts of activities in which any party hoping or expecting to invest a million dollars in an acquisition of a business in which the party expected to have an active, post-acquisition role would have engaged. They are, in other words, almost equally consistent with a mere expectation that a contract would be concluded as with a genuine belief that a binding contract already existed.

        In the last analysis, the question on this motion is whether a trier of fact, crediting Stein's evidence and drawing all permissible inferences in his favor, reasonably could find that the parties intended to be bound by the brief and obviously incomplete exchange in the February telephone call. Its determination requires consideration of all four factors. The nature of the deal and the lack of agreement on virtually any of the material terms cut powerfully in against any conclusion that the parties intended to be bound at that point. While the fact that there was no express reservation of a right not to be bound absent a writing and Stein's actions in the February to December period cut somewhat in his favor, they are too weak a foundation to support the edifice he would build upon it. I conclude that no reasonable trier of fact could find in his favor on this issue.

        Doubtless recognizing the weakness of his position, Stein argues that the issue of intent to be bound is inherently one of fact and that summary judgment therefore is impermissible. He relies on *Consarc Corp. v. Marine Midland Bank, N.A.*[37] Notwithstanding some language in that case that tends to support the argument, Stein's position ultimately is unpersuasive:

                "There is language in *Consarc* suggesting that summary judgment never may

---

[37]                996 F.2d 568, 576 (2d Cir. 1993).

be granted on the issue of intention to be bound, a suggestion for which it cites *Babdo Sales, Inc. v. Miller-Wohl Co.*, 440 F.2d 962, 965 (2d Cir. 1971).  *Consarc Corp.*, 996 F.2d at 576.  But the case is not properly so construed. In any case, the comment is dictum.

> "To begin with, the Second Circuit . . . affirmed the grant of summary judgment on precisely this issue in *R.G. Group, Inc.*, 751 F.2d at 77, a case cited with approval in *Consarc.*  Second, *Babdo Sales*, although it indicates that trials frequently will be required on the issue of intention, does not proscribe summary judgment in such cases where the record supports that relief.  To the contrary, it quotes approvingly from Corbin on Contracts to the effect that the question of intention to be bound 'may properly be left to a jury' in 'very many cases,' 440 F.2d at 965, thus of course implying that the issue properly is taken from a jury in others.  Moreover, *Babdo Sales*, and *Consarc*'s gloss upon it, must be read in light of the facts of those cases. * * *  Indeed, in *Consarc*, there was conflicting testimony as to whether the party resisting the claim had made an oral statement to the effect that there would be no legal obligation absent a written contract. 996 F.2d at 576.  In view of all of these considerations, the proper reading of the language in *Consarc* is simply that courts must be cautious in granting summary judgment, perhaps especially so where the issue is intent, but that summary judgment nevertheless may be appropriate in such a case if there is no genuine issue of material fact for trial."[38]

This conclusion is confirmed by Second Circuit decisions issued subsequent to *Consarc*.  One case affirmed a district court's decision to grant summary judgment dismissing a claim based on an alleged intention to be bound by a preliminary agreement where, after reviewing the undisputed facts, the Circuit concluded that "no reasonable factfinder could conclude" otherwise.[39]  In another case, the Circuit, affirming a summary judgment order finding intent to be bound, expressly rejected an argument that any review of extrinsic evidence precluded summary judgment, noting that "summary

---

[38]

  *Advanced Marine Techs., Inc. v. Burnham Sec., Inc.*, 16 F. Supp. 2d 375,  381 n.27 (S.D.N.Y. 1998); *see also Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.*, 383 F. Supp. 2d 428, 439 (S.D.N.Y. 2003) (determination of intention to be bound properly made on motion to dismiss, albeit with caution).

[39]

  *Adjustrite Sys., Inc.*, 145 F.3d at 551; *see also Brown v. Cara*, 420 F.3d 148, 154-56 (2d Cir. 2005); *Gorodensky v. Mitsubishi Pulp Sales (MC) Inc.*, 242 F.3d 365, 2000 WL 1804502, at *1 (2d Cir. 2000); *RKG Holdings, Inc. v. Simon*, 182 F.3d 901, 1999 WL 464979, at *2 (2d Cir. 1999).

14

judgment is . . . proper when 'the extrinsic evidence is so one-sided that no reasonable factfinder could decide contrary to one party's interpretation.'"[40]

---

[40]

*SCS Commc'ns, Inc. v. The Herrick Co., Inc.*, 360 F.3d 329, 342 (2d Cir. 2004) (quoting *Collins v. Harrison-Bode*, 303 F.3d 429, 434 (2d Cir. 2002); *see also Dodge St., LLC. v. Livecchi*, 32 Fed. Appx. 607, 611-12 (2d Cir. 2002).

2.      *Unjust Enrichment*

"In order to state a claim for unjust enrichment claim under New York law 'plaintiff

must show that (1) defendant was enriched, (2) the enrichment was at plaintiff's expense and (3) the

circumstances were such that equity and good conscience require defendant to make restitution.'"[41]

Moreover, "[w]hether a party is unjustly enriched is a legal conclusion."[42]

Stein seeks 25 percent of the present value of BLEW, less the equity capital he would

have invested under the parties' supposed agreement.  But there was nothing, in my view, that would

render Gelfand's retention of any such benefit unjust.[43]

Gelfand offered Stein an opportunity to participate in the acquisition of cellular

telephone assets.  The opportunity itself was contingent – it depended upon the acceptance of

Gelfand's offer by the seller and upon the approval by the FCC of the license transfer, both of which

would take time.  As in any such transaction, a certain amount of work had to be done in order to

move the transaction forward.

Both Stein and Gelfand expected that Stein would acquire an interest in the entity that

would acquire the assets, subject to the parties' ability ultimately to agree upon terms.  In such

circumstances, it would be entirely reasonable for both parties to invest effort in attempting to bring

---

[41]
        *Weisberg v. Smith*, 401 F. Supp. 2d 359, 362 (S.D.N.Y. 2005) (quoting *Harger v. Price*, 204 F. Supp. 2d 699, 710 (S.D.N.Y. 2002)).

[42]
        *In re First Cent. Fin. Corp.*, 377 F.3d 209, 213 (2d Cir. 2004).

[43]
        Although Gelfand might have been enriched in the amount of Stein's reasonable expenses in furtherance of the acquisition during the period between February and December 2003, Stein does not seek such relief here.  Joint Pretrial Order 26.  This order, submitted pursuant to my Individual Practices, "control[s] the subsequent course of the action unless modified by a subsequent order."  *See* FED. R. CIV. P. 16(e).

the proposed transactions to a successful conclusion.  Moreover, all concerned understand that their efforts ultimately may not succeed, in which event they will not be compensated.

In investing his efforts in bringing the acquisition to fruition, Stein took a chance that he and Gelfand would be unable to reach a deal.  There is nothing unjust in holding that he is not entitled to have Gelfand compensate him for having made a losing bet by engaging in preparatory activities against the possibility that they would prove to be of value to him.  This is especially so because Stein could have protected himself by insisting that he be compensated for his preparatory efforts in the event he and Gelfand ultimately did not come to terms on his participation in the deal. He elected not to do so.  Indeed, he elected not to do so despite the fact that, he claims, he repeatedly asked Gelfand to move forward in resolving all of the open issues between them but gained no substantive response until December 2003, just before the acquisition took place and after all or substantially all of Stein's efforts had been extended.[44]

### 3.   *Promissory Estoppel*

Finally, Stein claims a right to relief on the theory of promissory estoppel.  The claim, like the contract claim, rests on the assertion that Gelfand agreed that Stein could acquire 20 percent of the business and that the two would run it together, sharing profits and losses.

"[T]he elements of promissory estoppel under New York law are a clear and

---

[44]    The claim might have presented a closer question had Stein sought recovery of his out-of-pocket expenses relating to the cellular acquisition between February and December 2003, because it might have been argued that Gelfand took benefits when he arguably should have expected that Stein would not spend his own money for a business in which he ultimately would not participate.  However, as noted above, Stein seeks 25 percent of the business less his anticipated investment.  It is certainly not unjust for Gelfand to retain that benefit.

unambiguous promise, reasonable and foreseeable reliance, and resulting injury."[45]   Here, any

reliance by Stein on the alleged promise that he would be a 20 percent partner in the acquisition of

the business and that the parties would run it together would have been manifestly unreasonable.   As

an initial matter, Stein could not reasonably have relied upon the brief conversation in light of the

fact that it left for future resolution so many key terms.   This becomes even clearer when one

considers the improbability that Gelfand seriously intended to give Stein an equal role in the

operation of the business, as Stein claims, for 20 percent of the investment.


*Conclusion*

        For the foregoing reasons, defendant's motion for summary judgment dismissing the

complaint is granted.   Defendant's motion to permit late filing of the Rule 56.1 statement also is

granted.

        SO ORDERED.

Dated:        March 6, 2007


_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[45]

        *Advanced Marine Techs., Inc.*, 16 F. Supp. 2d at 381 (citing *R.G. Group, Inc.*, 751 F.2d at
78).